UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANEUDY CASILLAS,

                    Petitioner,                    **No. 03-CV-6119(CJS)(VEB)**
                                                   **REPORT AND RECOMMENDATION**

        -vs-

TIMOTHY P. MURRAY, Superintendent
of Groveland Correctional Facility,

                    Respondent.
_____

**I.      Introduction**

        Petitioner Aneudy Casillas ("Casillas" or "petitioner'), proceeding *pro se*, has filed a

petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his state-court

custody pursuant to a judgment of conviction entered against him in New York State Supreme

Court, Erie County, for charges of burglary in the second degree, attempted robbery in the first

degree, criminal possession of a weapon in the fourth degree, and two counts of menacing in the

second degree.  This matter has been referred to the undersigned pursuant to 28 U.S.C. §

636(b)(1) for the purpose of hearing and reporting on the disposition of Casillas' petition. For the

reasons that follow, I recommend that the petition be denied.

**II.     Factual Background and Procedural History**

        **A.      Pre-Trial Proceedings and the Trial**

        At about 9:45 p.m. on November 14, 1997, a man wearing a ski mask and wielding a

butcher knife attempted to rob Pizzeria DiPirro, a family-owned business located at 273 Niagara

Street in the City of Buffalo.  At the time of the incident, two adult members of the DiPirro

family were in the pizzeria–Timothy DiPirro and his mother Donna DiPirro.  The robber was

hiding in a back room of the pizzeria when he surprised Mr. DiPirro and demanded money that

had just removed from a cash register.  Mr. DiPirro fled into the kitchen of the pizzeria, where he

held the assailant at bay with a chair.  At this point, the assailant grabbed Mrs. DiPirro, who was

also in the kitchen, and held the knife to her throat.  Mrs. DiPirro fought with the assailant,

scratched him on his neck, and managed to break free from his grasp. After being struck several

times by soda bottles thrown at him by Mr. DiPirro, the robber ran out of the pizzeria.  Mr.

DiPirro called 911.

  Buffalo Police Officers Anthony LaPiana and Alex Benitez immediately responded to

the radio dispatch describing a suspect with a knife at 273 Niagara Street.  After speaking with

Mr. DiPirro several witnesses who were outside the pizzeria when the attacker fled, the officers

broadcasted the following description of the perpetrator: a Puerto Rican male, 16 to 17 years old,

approximately 5' 10", with a thin build, wearing dark clothes and a white "hoody."

  Officers LaPiana and Benitez found a butcher knife on the ground near the front door of

the pizzeria but did not find any other physical evidence.  The officers then took Mr. DiPirro for

a short ride around the neighborhood in their patrol car to look for the robber.

  Meanwhile, Buffalo Police Officer Salvador Juste was in a marked patrol car on Whitney

Street, several blocks from the pizzeria.  After hearing the broadcasted description, he began

patrolling the area with his headlights off.  Officer Juste observed a Puerto Rican male, later

identified as Casillas, walking on Georgia Street towards the intersection with Whitney Street.

When Officer Juste pulled up to the corner of Whitney Street and Georgia Street, petitioner

noticed the patrol car and then stopped walking.  Petitioner turned around and walked several

steps in the opposite direction (away from Whitney Street and Officer Juste's patrol car), turned around again to look back at the patrol car, took another step, and then stopped. Casillas then looked up at an apartment building and began yelling. Officer Juste observed that the petitioner's winter jacket was inside out.

Officer Juste got out of his patrol car and approached Casillas who was breathing heavily. Petitioner replied affirmatively when asked if he could speak English but did not answer Officer Juste's inquiry as to where he was coming from. Officer Juste patted down Casillas and then placed him in the patrol car.

At Officer Juste's request, Officers Benitez and LaPiana repeated the description of the attacker; it matched the petitioner, except that Casillas was not wearing a white "hoody." Officer Juste met Officers Benitez agreed to meet at the pizzeria. Officer Juste then told petitioner, who was still in the back seat of the patrol car, that there had been a robbery, that he was a suspect, and that they were going to the crime scene for an identification procedure.

Officers Benitez and LaPiana, who were in their patrol car with Mr. DiPirro, headed back to the pizzeria. The two patrol cars arrived at the pizzeria at about the same time, pulling up along the sidewalk near the pizzeria. Mr. DiPirro exited Officer Benitez's and Officer LaPiana's patrol car. Officer Juste let the petitioner out of his patrol car. Mr. DiPirro immediately identified him as the attacker, but mentioned that the jacket was different. One of the officers removed Casillas' coat, reversed it so that it was no longer inside-out, and put it back on him. Mr. DiPirro identified the coat as the one the attacker was wearing. The officers then had Mr. DiPirro step back from Officer Juste's patrol car. They brought the petitioner to the front of the patrol car and shined their flashlights on him. When asked if he could positively identify

3

petitioner, Mr. DiPirro stated that petitioner was the man who had robbed and attacked him. Officer Juste turned the petitioner over to Officer Benitez and Officer LaPiana and left the scene.

After Mr. DiPirro made his second identification, Officer Benitez and Officer LaPiana escorted the petitioner into the pizzeria. Once the officers and the petitioner were inside the brightly lit pizzeria, Mrs. DiPirro positively identified the petitioner by exclaiming, "[T]hat's the one," before being asked or told anything by the officers. Officer LaPiana asked Ms. DiPirro if she was sure and she replied that she was.

Casillas was taken outside where he spontaneously commented that he had been in the pizzeria earlier that day, but that he was not involved with the robbery. Officer Benitez instructed the petitioner not to say anything else. Petitioner was placed under arrest and read his *Miranda* warnings verbatim from a pre-printed card. Officer Benitez asked the petitioner if he understood his rights, and the petitioner replied that he did. Petitioner did not ask for an attorney.

As Officer Benitez and Officer Juste were taking the petitioner to Central Booking, petitioner stated, unprompted by any police questioning, that his twin brother had robbed the pizzeria. At Central Booking, petitioner again stated without prompting that his brother had robbed the pizzeria. He also stated that he knew where his brother was and that he could take the officers to him.

While at Central Booking, Mrs. DiPirro told Officer Benitez about the scratches she had inflicted on the assailant's neck during her struggle with him during the attempted robbery. Officer Benitez told Officer LaPiana that petitioner might have scratches on his neck as a result of the struggle with Ms. DiPirro. Petitioner, who apparently overheard this conversation, then stated that he had a fight with his girlfriend earlier that night and that she had scratched him.

Petitioner was arraigned the next day and entered a plea of not guilty.  On or about

January 29, 1998, an Erie County Grand Jury returned a five-count indictment against petitioner,

charging him with burglary in the second degree, attempted robbery in the first degree, criminal

possession of a weapon in the fourth degree, and two counts of menacing in the second degree.

A hearing was held on May 6, 1998, to address petitioner's motion to preclude in-court

identifications by the DiPirros on the ground that the show-up identifications on the night of

November 14, 1997, were unduly suggestive.  Petitioner also moved to suppress his statements to

the police on the evening of November 14, 1997, on the ground that the statements violated his

constitutional rights.  After a hearing on June 24, 1998, the trial court denied both motions,

finding that the show-up identifications did not involve any improper police conduct and that the

petitioner's statements to police were spontaneous and not the result of unlawful police conduct.

See Transcript of October 6, 1998  Motions Hearing at 9-18.  Petitioner was represented by

Nelson S. Torre, Esq., at these and other pre-trial proceedings.

On October 8, 1998, prior to the start of trial, the trial court declared a mistrial pursuant to

New York Criminal Procedure Law ("C.P.L.") § 280.10, with the consent of petitioner.

Apparently, defense counsel Torre had informed the court just before trial was about to begin that

he could be called as witness because he had a conversation with petitioner's brother during

which the brother allegedly admitted committing the crime. A new trial was then scheduled for

December 1, 1998.  Petitioner was represented by Michael P. Clohessy, Esq. in the subsequent

proceedings.

The witnesses for the prosecution were the DiPirros and the police officers; their

testimony has been summarized above in this Report and Recommendation. The defense called

several witnesses, and petitioner testified in his own behalf. First, Casillas' girlfriend, Maria Agosto Rivera ("Rivera") testified that on November 14, 1997, she was at home with the petitioner until about 9:15 p.m., when someone called out to him from the street below the apartment. Shortly thereafter, Casillas took off his pajamas, put on jeans and a jacket, and left the apartment. Rivera also testified that she had a fight with the petitioner on November 14, 1997, and during the fight, she scratched him on the neck.

Luis Melendez ("Melendez") testified that his wife, Carmen Melendez ("Carmen"), was petitioner's cousin. Melendez was at home with his family on the evening of November 14, 1997, when petitioner's brother, Jose Casillas, showed up at around 8 p.m. According to Melendez, Jose appeared "scared or nervous." T. 251.[1] At about 9 p.m., Jose left his house, wearing something over his face, a winter hat, and a hooded "jogging sweater." T. 253. Melendez also testified that Jose had a "handle" protruding from his pants. Apparently, Mr. Melendez watched Mr. Casillas head in the general direction of the pizzeria. See T. 256 ("I saw him close in the back of the pizzeria as he was walking").

Melendez then went to petitioner's apartment to ask him to help search for Jose. According to Melendez, petitioner agreed and got into Melendez's car. After driving for a short distance, Melendez instructed petitioner to check a local gas station and restaurant, at which point petitioner exited the car. Melendez did not see petitioner again that evening.

On cross-examination, Melendez acknowledged that he met with the petitioner a few days after the attempted robbery but denied having an extensive conversation about the charges that were pending against him. Melendez testified that he previously told an investigator from the

---

[1]         Citations to "T.__" refer to pages of the trial transcript.

prosecutor's office that petitioner is right-handed and that his right hand is weak. He also testified that the petitioner's brother was not wearing a winter coat–just a hooded sweatshirt or sweater–when he left Melendez's house on the night of November 14, 1997. He denied telling an investigator from the prosecutor's office that the petitioner was wearing an "orange firemen's coat" on the night of the attempted robbery.

Melendez testified that on the night of the attempted robbery he did not mention his suspicions about the petitioner's brother to the DiPirros (whom he talked to at the police station) or to the police. Finally, he admitted that he did not know exactly what time it was when he dropped off petitioner or where petitioner went after he dropped him off.

After a brief redirect examination, Melendez testified on re-cross-examination. He testified that when he spoke to the DiPirros at the police station, they described what the assailant was wearing (i.e, white ski mask, black jacket). He admitted telling an investigator from the prosecutor's office that when he saw the petitioner's brother, José, later on the night of November 14, 1997 and again the next day that he did not notice any scratches on Casillas's neck.

Carmen Melendez, Luis Melendez's wife and petitioner's cousin, stated that a little after 9 p.m. on November 14, 1997, she and her husband left their house to look for the petitioner. Carmen said that she and her husband were worried about petitioner's brother, who just left their house. She testified that they were worried petitioner's brother was "going to do something" after they witnessed him putting a "t-shirt" over his face and behaving strangely. T. 296. Carmen described how she and her husband, along with their seven children, went to the petitioner's apartment to recruit his help in the search for his brother. When petitioner came down from his

apartment, he was wearing jeans, a pajama top, and a coat. Carmen recounted that after petitioner got into the car, she told him about his brother's behavior in her home. She stated that her husband, who was driving, dropped off the petitioner in front of a gas station on Niagara Street because this was the area where they thought they would find the petitioner's brother.

Carmen testified that she and her husband then drove to her parents' house, where they left their children. She explained that she and her husband went back to the petitioner's house to meet him and then returned to her parents' house because the petitioner was not home.

On cross-examination, Carmen denied talking to her husband about his testimony at trial on the previous day. She acknowledged that she had no idea where the petitioner went after she and her husband dropped him off on the night of November 14, 1997.

Petitioner testified on his own behalf. He explained that he was asleep on evening of November 14, 1997, from about 6 p.m. until about 9 p.m. At around 9 p.m. he woke up after he heard his cousin, Carmen, calling him from the street below his apartment. After talking to his cousin from the window of his bedroom, he left the apartment wearing his pajama top and jeans. He said that he was carrying his jacket in his hand and that he had nothing in his pockets.

Petitioner testified that after he got into his cousin's car, his cousin described that his brother had left her house acting "crazy." T. 312. He stated that his cousin and her husband dropped him off on Niagara Street, near the intersection with Georgia Street, to look for his brother. Petitioner testified that he walked around the neighborhood looking for his brother for a short time before noticing a police car. He described following the police car to the pizzeria. He then testified that when he walked past the pizzeria, he and Mr. DiPirro, who was talking to a police officer, made eye-contact.

Petitioner explained that after walking past the pizzeria, he headed towards his apartment building, which is located on Georgia Street and Prospect Street. He noticed another police officer approaching him. Petitioner yelled up to the apartment (presumably to get the attention of Rivera, with whom he was living at the time). He then testified about his encounter with Officer Juste:

Q.    Then what happened?
A.    He [Officer Juste] called me.
Q.    What did you do?
A.    I went towards him.
Q.    Then what happened?
A.    He asked me where was the mask.
Q.    What did you tell him?
A.    I asked him what mask he was talking about.
Q.    Then what happened, sir?
A.    He patted me down and put me in the patrol car.

T. 315. The petitioner described what happened next as follows:

Q.    What happened after you got in the squad car, sir?
A.    We went towards the direction of the pizzeria.
          . . . .
Q.    Now, what happened, you went to Pizzeria DiPirro with a police officer?
A.    The police officer going to take me out of the car and since I was on the
      left side of the car, when I put my left foot out to get out and then I went to
      put my right foot out, the person in the pizzeria said it was me.
Q.    What happened after that occurred, sir?
A.    I was handcuffed.
Q.    . . . [W]hat did the police do then?
A.    He brought me inside the store [pizzeria].
Q.    Then what happened, sir?
A.    And his mother [Mrs. DiPirro] said it was me too.
Q.    What did you do then?
A.    I kept saying it wasn't me.
          . . . .
Q.    Now, do you recall having a conversation with any of the police officers?
A.    Yes, after the person [Mr. DiPirro] said it was me.
Q.    After the person said it was you, what did you do?
A.    I  told him that it was my brother.

9

> Q. Why?
>
> A. Why? Since, they [his cousin, Carmen Melendez, and her husband Luis Melendez] told me that he was in that vicinity, I took it upon myself to imagine it was because to me, it was too much of a coincidence.
>
> Q. . . . [C]an you recall telling them [the police] that it was your twin brother?
>
> A. No, the only thing I said was my brother.

T. 317-320. Petitioner explained why he had his coat on inside-out when he was stopped by the police. Petitioner testified that when he ran out of his apartment to meet his cousin Carmen, he had just woken up, he was in a hurry, and he didn't notice that the coat was inside out.

Petitioner also claimed that his girlfriend, Rivera, scratched him during a fight they had on the morning of November 14, 1997, that was why he had scratches on his neck when he was arrested. Petitioner described the scratches as being "dry" by the time the police detained him later that day.

When he was taken to police headquarters, petitioner stated that the police did not find anything in his pockets and that they did not look at his neck. On cross-examination, the petitioner acknowledged that neither Mr. DiPirro nor Mrs. DiPirro hesitated when they identified him on the night of November 14, 1997. After a series of questions about the testimony of the prosecution's witnesses, petitioner and the prosecutor had the following exchange:

> Q. After Ms. DiPirro identified you, you told the police that you were in there [i.e., the pizzeria] earlier but you didn't rob them?
>
> A. In no moment did I say that.
>
> Q. The police officer is lying?
>
> A. Could be.

T. 327. Soon after that exchange, the prosecutor asked the petitioner questions about his familiarity with the police:

> Q. You have been in this country for more than three years?

10

|   |   |
|---|---|
| A. | I am going on three years. |
| Q. | You are familiar with the police? |
|    | [Defense counsel]: I object. There has been no testimony, familiar with the police. |
|    | The Court: Sustained. You can rephrase that. |
| Q. | You know what a police car looks like? |
| A. | Yes. |
| Q. | You know that the police help people? |
| A. | Yes. |

T. 331.

Petitioner denied being read his *Miranda* warnings and denied mentioning that his "twin brother" committed the crime. Petitioner also denied overhearing Officer Benitez tell Officer LaPiana that Mrs. DiPirro might have scratched him on his neck.

After the defense case, the People called three rebuttal witnesses. First, Officer Howarth Colon testified that he received a call from petitioner's girlfriend, Rivera, and that during the call Rivera informed him that the petitioner was innocent. Officer Colon stated that Rivera said that she was with the petitioner at the time the attempted robbery occurred and further that she had been with the petitioner all day on November 14, 1997.

Second, Mrs. DiPirro testified on rebuttal about several occasions after November 14, 1997, when Rivera visited the pizzeria and asked questions about the attempted robbery. Mrs. DiPirro testified that among other questions, Rivera asked her why the petitioner "did it," which it appears Mrs. DiPirro understood to mean, why did petitioner commit the robbery. T.341. Rivera informed Mrs. DiPirro that she had sent petitioner to the drug store on the night of November 14, 1997. Mrs. DiPirro stated that Rivera did not mention the petitioner's brother during any of those conversations. Mrs. DiPirro testified that she noticed a "slight weakness" in

the attacker's right arm when she was struggling with him during the robbery. T. 342-343.

Third, John Cleary, an investigator with the Erie County District Attorney's Office, testified about a conversation he had with Luis Melendez. Investigator Cleary described how he went to Melendez's residence and spoke with him through an interpreter, Eddie Coraro, a friend of Melendez's who happened to be present. Investigator Cleary recounted Melendez's description of events on November 14, 1997:

> He [Mr. Melendez] was talking mostly in Spanish with a few English words. . . . [T]hrough Eddie Coraro, he told me that he picked up–about 8:30 or 9:00 [p.m.], . . . Aneudy Casillas at 273 Georgia Street in his vehicle. Mr. Melendez was driving. . . . They drove around the West Side for about ten minutes and . . . he dropped Mr. Casillas off at Georgia and Carolina Street after ten minutes of driving around. . . . Later that night he went back looking for Aneudy Casillas and couldn't find him and he heard word on the street that he got picked up by the police. I asked him, Mr. Melendez, what he was wearing at the time you were driving him around and dropped him off on Georgia Street, and he said this–[describing] the coat [half in English and half in Spanish], . . . like an orange fireman's coat with orange florescent stripes . . . going around the coat and sneakers on. That is what he told me that Mr. Casillas was wearing that evening.

T. 348.

The jury returned a verdict finding petitioner guilty of all five counts: burglary in the second degree, attempted robbery in the first degree, criminal possession of a weapon in the fourth degree, and two counts of menacing in the second degree.

## B.     Post-Trial Proceedings

On or about January 22, 1998, prior to sentencing, counsel for petitioner filed a motion pursuant to New York Criminal Procedure Law ("C.P.L.") §§ 330.30, 330.40, and 330.50, asking the trial court to set aside the jury's verdict. The motion was based on two grounds. First, petitioner argued that the verdict should be set aside pursuant to C.P.L. § 330.30(1) because the

record included an issue which, if raised on appeal, would require reversal of the judgment as a matter of law. Specifically, petitioner claimed that improper translation of the testimony of defense witnesses (given in Spanish and translated into English) by the court interpreter prevented the jury from understanding the correct meaning of the witnesses' statements and that the jury would not have found the petitioner guilty if the interpretations had been accurate. Several examples of alleged misinterpretation by the court interpreter were detailed in the petitioner's moving papers.

Petitioner's second basis for the motion to set aside the verdict was "newly discovered evidence", pursuant to C.P.L. § 330.30(3). In his affidavit supporting the motion, counsel for petitioner stated that petitioner's former attorney informed him–after the jury's verdict–about prior conflicting testimony given by Donna DiPirro in an unrelated civil case. The petitioner claimed that during this prior testimony, Mrs. DiPirro's statements indicated that she was not working at the pizzeria for some unspecified period of time prior to January 1998. According to the petitioner, this was inconsistent with Mrs. DiPirro's testimony at trial, where she stated that she saw the petitioner at the pizzeria at least three days a week for six weeks prior to November 14, 1997. The petitioner argued that information about this prior testimony would have allowed effective cross examination of Mrs. DiPirro on the issue of her credibility, which would have "significantly affected the outcome of the trial."" Clohessy Affidavit in Support of C.P.L. § 330.30 Motion, ¶ 19.

On February 3, 1999, petitioner and defense counsel, appeared before Judge DiTullio for argument of petitioner's motion to set aside the verdict and for sentencing. Judge DiTullio denied petitioner's motion in its entirety. Judge DiTullio found petitioner's first argument, based

on errors in translation by the Court interpreter, without merit. Judge DiTullio noted that "for an error to constitute an error of law there must be a timely protest. . . . There was no such protest here and in fact no objection was made at any time during the course of the trial proceedings." T. 508. Judge DiTullio added that "the alleged mistranslation[s], even if accepted as errors, do not rise to the level of error of law requiring reversal or modification of the convictions." T. 508. After discussing each of the alleged errors in translation, Judge DiTullio concluded that the "perceived errors were harmless and not grounds for setting aside the verdict." T. 509.

Judge DiTullio also found petitioner's second basis for the motion to set aside the verdict to be without merit. Judge DiTullio ruled that the evidence of Mrs. DiPirro's allegedly contradictory testimony in an unrelated civil case (i.e., single page from trial transcript) was legally insufficient because it did not satisfy the requirements for newly discovered evidence: (i) that the evidence must not be merely impeachment material and (ii) that the evidence would probably change the results if a new trial was granted. Judge DiTullio noted that because the evidence of Mrs. DiPirro's prior testimony constituted impeachment material only, it was within the court's discretion to deny the petitioner's motion to set aside the verdict. Judge DiTullio concluded that the "in light of the overwhelming proof of guilt and positive identification . . . by another witness . . . it cannot be said that this alleged newly discovered evidence is of such quality and nature that would probably change the verdict" if a new trial were granted. T. 511.

At the conclusion of the February 3, 1998 proceeding, Judge DiTullio sentenced petitioner as follows: count one, burglary in the second degree, 5 to 10 years; count two, attempted robbery in the first degree, 5 to 10 years; count three, criminal possession of a weapon in the fourth degree, one year; and counts four and five, menacing in the second degree, one year

for each, with the sentences running concurrently.

On his direct appeal to the New York State Supreme Court, Appellate Division, Fourth Department, petitioner was represented by new appellate counsel. See Petition at 7. Petitioner's appeal raised seven issues: (1) that petitioner was detained and transported to the crime scene without reasonable suspicion and, consequently, that the trial court erred in not suppressing the show-up identifications by Timothy DiPirro and Donna DiPirro and petitioner's statements to the police; (2) that the show-up identification procedures were unduly suggestive and that the trial court erred in not suppressing the identifications; (3) that the evidence was legally insufficient to convict petitioner of the offenses in the indictment and that the verdicts were against the weight of the evidence; (4) that trial counsel was ineffective for failing to call petitioner's brother as a witness; (5) that petitioner was denied the right to a fair trial because of the prosecutor's misconduct during his testimony on cross-examination and during summation; (6) that the trial court abused its discretion in denying, without a fact-finding hearing, petitioner's motion to set aside the verdict based on his counsel not learning about the following allegations until after trial, thus depriving petitioner of a fair trial: (a) errors by the interpreter at trial and (b) testimony given by one of the victims in a prior unrelated civil action that was inconsistent with the witness's testimony at trial; and (7) that petitioner's sentence was unduly harsh and excessive.

The Fourth Department unanimously affirmed petitioner's conviction. *People v. Casillas*, 289 A.D.2d 1063 (App. Div. 4th Dept. 2001). The New York Court of Appeals denied leave to appeal on March 29, 2002. *People v. Casillas*, 97 N.Y.2d 752 (N.Y. 2002).

This timely habeas petition followed in which Casillas asserts the following grounds for relief: (1) the police officers' detention of petitioner for the show-up identifications was

unreasonable because the radioed description of the perpetrator was vague and general, and he

was subjected to racial profiling when he was detained by the police; (2) the show-up

identifications were suggestive and overtly prejudicial; (3) trial counsel was ineffective because

he failed to call petitioner's brother as a witness; (4) the prosecutor committed misconduct when,

during cross-examination of petitioner, the prosecutor called him a "liar" and commented that,

"being a foreigner in the United States", petitioner knew who the police were; and (5) the trial

court improperly denied the petitioner's motion to set aside the verdict based on newly

discovered evidence (i.e., errors by the interpreter during the trial and prior inconsistent

deposition testimony given by Mrs. DiPirro in an unrelated civil action).

## III.    Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

federal court may grant habeas corpus relief only if the State courts decided the claim on the

merits and the decision (1) "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §

2254(d)(1), or (2) "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

The Second Circuit has described the statutory requirement in 28 U.S.C. section

2254(d)(1) as follows:

> [A] decision is contrary to clearly established Federal law if it contradicts the
> governing law or if the state court confronts a set of facts that are materially
> indistinguishable from a decision of the Supreme Court and nevertheless arrives at
> a result different from the Supreme Court.  An unreasonable application of federal
> law is more than an incorrect application, but the petitioner need not show that all
> reasonable jurists would agree that a state court determination is incorrect in order
> for it to be unreasonable.  Instead, a federal court should review a state court's

interpretation of federal law using a standard of objective reasonableness.  The
increment of incorrectness beyond error need not be great; otherwise, habeas relief
would be limited to state court decisions so far off the mark as to suggest judicial
incompetence.

*Yung v. Walker*, 341 F.3d 104, 109-10 (2d. Cir. 2003).

With regard to 28 U.S.C. section 2254(d)(2), factual determinations made by State courts

are "presumed to be correct." 28 U.S.C. § 2254(e)(1).  Furthermore, "[t]he [petitioner] shall have

the burden of rebutting the presumption of correctness by clear and convincing evidence." 28

U.S.C. § 2254(e)(1).

## IV.     Analysis of the Petition

### A.     Ground One: Unreasonableness of the Police Officer's Stop and Detention of Petitioner

The United States Supreme Court has held that as long as a State "has provided an

*opportunity* for a full and fair litigation of a Fourth Amendment claim, the Constitution does not

require that a state prisoner be granted federal habeas corpus relief on the ground that evidence

obtained in an unconstitutional search or seizure was introduced at trial." *Stone v. Powell*, 428

U.S. 465, 481-82, 96 S.Ct. 3037 (1976) (emphasis added).  In other words, a State trial court's

refusal to apply the exclusionary rule after a full and fair litigation of a defendant's Fourth

Amendment claim generally can not serve as the basis for relief in a Federal habeas corpus

proceeding. The Second Circuit has interpreted *Stone v. Powell* to allow for habeas review of

Fourth Amendment only in two situations: (1) when the State "has provided no corrective

procedures at all to redress the alleged [F]ourth [A]mendment violations"; or (2) when the State

"has provided a corrective mechanism, but the defendant was precluded from using that

mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). In *Capellan*, the Second Circuit also noted that the Federal courts regard "New York's procedure for litigating Fourth Amendment claims, embodied in [C.P.L. section] 710.10 *et seq*. . . ., as being facially adequate." *Id.* (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)). Consequently, a petitioner convicted in the New York courts will be entitled to relief only if the trial court did not allow the petitioner to avail himself or herself to the procedures in C.P.L. § 710.10 *et seq.* or if there was an "unconscionable breakdown" in the application of those procedures.

In this case, the petitioner has not shown, or even alleged, that there was an "unconscionable breakdown" of the corrective procedures that are mandated by statute in New York. Even if the petitioner had made such an allegation, nothing in the record supports a finding that there was an "unconscionable breakdown" in the corrective process of which petitioner availed himself. First, I note that the trial court held an evidentiary hearing prior to trial and thereafter ruled on the merits of the petitioner's Fourth Amendment claim, setting forth its findings of fact, conclusions of law, and the rationale for the ruling, all consistent with the requirements of C.P.L. § 710.10 *et seq.* The trial court also denied the petitioner's motion to suppress the show-up identifications and his statements to the police. On direct appeal, the Appellate Division again reviewed the merits of the petitioner's Fourth Amendment claim and affirmed the suppression court's ruling.

**B.      Ground Two: Suggestiveness of the Show-up Identification Procedures**

Petitioner's second argument is that the show-up identifications were unduly suggestive. After the pre-trial Wade hearing, the trial court ruled the show-up identifications by Timothy

DiPirro and Donna DiPirro were not impermissibly suggestive. See Transcript of October 6, 1998 Motions Hearing at 17-18. The Fourth Department affirmed the trial court's ruling, holding that "the show[-]up identification procedures were not unduly suggestive, nor was the second show[-]up procedure [i.e., by Mrs. DiPirro] rendered unnecessary by the first victim's identification." *People v. Casillas*, 289 A.D.2d at 1064 (citations omitted). This claim, having been adjudicated on the merits by the state courts, is subject to review under § 2254(d)(1) of AEDPA.

The clearly established Supreme Court precedents concerning the suggestiveness of identification procedures include *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967 (1967), *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972), and *Manson v. Braithewaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977). In *Stovall*, the Supreme Court held that show-up identifications violate due process only when the identifications are conducted in a manner that renders them "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." 388 U.S. at 293, 87 S.Ct. 1967. Even if the identification procedures are found to be unnecessarily suggestive, exclusion of the identification evidence is not warranted if "under the 'totalilty of the circumstances' the identification was reliable." *Biggers*, 409 U.S. at 199, 93 S.Ct. 375. In *Biggers*, the Supreme Court listed five factors to be considered when evaluating the reliability of identification procedures: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *See id.* at 199-200. The reviewing court must weigh the "corrupting effect" of the suggestive

identification procedures against the five factors enunciated in *Biggers*. *Manson*, 432 U.S. at

114. Pre-trial identifications, therefore, are only excluded if they are the product of unnecessarily

suggestive procedures and are unreliable. *See United States v. Bautista*, 23 F.3d 726, 729-30 (2d

Cir. 1994).

Applying the standard of review from AEDPA, the Court recommends finding that the

State courts' decisions were neither "contrary to" the relevant Supreme Court precedents, nor an

"unreasonable application" of those precedents. Nor did they involve an "unreasonable

determination of the facts" in light of the evidence presented at trial. 28 U.S.C. § 2254(d)(1), (2).

First, it was not unreasonable for the State courts to conclude that the show-up

identifications involving the DiPirros were not unnecessarily suggestive. Show-up

identifications procedures are not inherently unconstitutional. *See United States v. Zelker*, 455

F.2d 714, 716 (2d Cir. 1972) (noting that "[i]t is now settled law that prompt on-the-scene

confrontation is 'consistent with good police work,' and does not offend the [constitutional]

principles established in *United States v. Wade*. . . . [P]rompt confrontation [is] desirable because

it serve[s] to insure the immediate release of an innocent suspect and at the same time enable[s]

the police to resume the search for the fleeing culprit when the trail is fresh") (citations omitted).

In *Zelker*, the victim identified two robbery suspects within 30 minutes of the crime, while the

defendants were in the back of a police car. Here, the DiPirros identified the petitioner within 15

or 20 minutes of the attempted robbery, while he was accompanied by police officers. In *Zelker*,

the victim had 15 second or less to observe the suspects during the crime. In this case, the

DiPirros had a minute or two to observe the assailant during the attempted robbery. In *Zelker*,

the victim noted that the suspects looked like the men who robber her, but that they were

"dressed differently."  Here, Mr. DiPirro made a similar comment when he first identified the petitioner, who was then wearing his jacket inside-out. *Cf. Zelker*, 455 F.2d at 715-716. The Second Circuit in *Zelker* held that the show-up identification by the victim was not impermissibly suggestive.  *Id.*; *see also Bautista*, 23 F.3d 726, 730 (affirming admission of on-scene identification evidence and noting that "[t]he fact that the suspects were handcuffed [in this case, petitioner was not in handcuffs], in the custody of law enforcement officers [petitioner in this case was also accompanied by law enforcement officers], and illuminated by flashlights did not render the pre-trial identification procedure unnecessarily suggestive").

Second, even assuming that the show-up identification procedures used by the  police in this case were unnecessarily suggestive, the Court recommends finding that, considered in light of the five *Biggers* factors, the identifications by the DiPirros were not unreliable.  First, although their assailant's face was partially covered during the attack, both Mr. DiPirro and Mrs. DiPirro had a minute or two to observe him, and his nose and eyes were not covered.  The second factor favors respondent as it it is reasonable to conclude that both witnesses had a high degree of attention during the attack.  The third factor, the witnesses' ability to give a description of the criminal, does weigh in petitioner's favor, since Mrs. DiPirro did not have an opportunity to provide a prior description and Mr. DiPirro was only able to give a general description to the police during the 911 call. However, the shortcoming is partially mitigated by Mr. DiPirro's unsolicited comment that the petitioner's coat was different during his first identification. The fourth factor weighs in respondent's favor since both witnesses made spontaneous, unprompted identifications and exhibited a high level of certainty. Fifth, the show-up identifications were made within 15 or 20 minutes of the crime, and so this factor favors respondent. *See Biggers*, 409

U.S. at 199-200.  Finally, the Court recommends concluding that the reliability of the DiPirros'

identifications outweighed any "corrupting effect" the show-up identification procedures might

have had. *See Manson*, 432 U.S. at 114, , 97 S.Ct. 2243 (concluding that "reliability is the

linch-pin" of determining the admissibility of testimony).

### C.      Ground Three: Ineffective Assistance of Trial Counsel

Casillas' third contention is trial counsel was ineffective in failing to call his brother, José

Casillas, as a witness.  José Casillas allegedly confessed to petitioner's first trial attorney, Nelson

Torre, that he had committed the crimes for which petitioner was charged.  As discussed above in

this Report and Recommendation, this incident led to attorney Torre withdrawing as defense

counsel on the basis that he could potentially be called as a witness. Prior to the start of the

rescheduled trial, however, José Casillas gave a sworn statement recanting his previous

confession to attorney Torre, stating that he had been was lying. On direct appeal, the Fourth

Department rejected this claim of ineffectiveness on the merits, holding as follows:

> Defendant was not denied effective assistance of counsel by the failure of defense
> counsel to call defendant's brother as a witness. An earlier trial of this indictment
> ended in a mistrial based on statements made to defendant's previous attorney by
> defendant's brother. An attorney may not suborn perjury, and thus defendants'
> attorney at the retrial may have had an ethical obligation to refuse to call
> defendants' brother as a witness (*see*, Code of Professional Responsibility EC
> 7-26; DR 7-102 (22 NYCRR 1200.33); *see also*, *People v Appel*, 120 AD2d 319,
> 320-321 [(App. Div. 3d Dept. 1986) [("Defense counsel had an ethical duty not to
> assist in the presentation of perjured testimony to the court (see, Code of
> Professional Responsibility, EC 7-26; DR 7-102), and the ethical requirement that
> he zealously represent his client cannot overcome the proscription against aiding
> the giving of perjured testimony[.]")], *lv denied*, 69 NY2d 824). In any event, the
> evidence, the law and the circumstances of this case, viewed in totality and as of
> the time of the representation, establish that defendant received meaningful
> representation (*see*, *People v Baldi*, 54 NY2d 137, 147).

*People v. Casillas*, 289 A.D.2d at 1064. I recommend finding that this ruling was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent governing Sixth Amendment ineffective assistance claims. *See Strickland v. Washington*; *Nix v. Whiteside*.

The Supreme Court held in *Strickland v. Washington* that in order "to obtain relief by way of federal habeas corpus on a claim of a deprivation of effective assistance of counsel under the Sixth Amendment, the movant must establish both serious attorney error and prejudice." *Nix v. Whiteside*, 475 U.S. 157, 164 (1986) (citing *Strikcland*, 466 U.S. at 687-88). The deficient performance prong of *Strickland* requires demonstrating "errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *accord Nix*, 475 U.S. at 164. To show prejudice, the petitioner must establish "that the claimed lapses in counsel's performance rendered the trial unfair so as to 'undermine confidence in the outcome' of the trial." *Nix*, 475 U.S. at 164 (quoting *Strickland*, 466 U.S. at 694). The Sixth Amendment "does not require any particular response by counsel to a problem that may arise" during trial; "[r]ather, the Sixth Amendment inquiry is into whether the attorney's conduct was 'reasonably effective.'" *Id.* In order to "counteract the natural tendency to fault an unsuccessful defense," the reviewing court "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689).

In *Nix v. Whiteside*, the Supreme Court confronted question of how to define " the range of "reasonable professional" responses to a criminal defendant client who informs counsel that he will perjure himself on the stand." 475 U.S. at 166. In *Strickland*, the Supreme Court "recognized counsel's duty of loyalty and his 'overarching duty to advocate the defendant's cause,'" 466 U.S.

at 688. However, the Supreme Court clarified, that "duty is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth[,]" *Nix*, 475 U.S. at 166, and "[a]lthough counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or [to] otherwise violat[e] the law[,]" *id.*

In light of *Nix*, the Appellate Division did not unreasonably apply clearly established Supreme Court precedent in concluding that trial counsel, in order to comply with his ethical obligations, reasonably decided not to call petitioner's brother as a witness, given his totally contradictory version of events. As noted above, petitioner's brother at first allegedly confessed orally to petitioner's first attorney, but later did an about-face, recanting his confession. While the "confession" was never reduced to writing, and was not sworn, Jose's later statement retracting his admissions was sworn. A habeas "[p]etitioner must do more than point to tactical decisions that, in hindsight, constituted an unsuccessful–but reasonable–defense strategy in order to show ineffectiveness on the part of his lawyer" *Tusa v. Jones*, 1996 WL 1088208, *4 (E.D.N.Y. Sept. 3, 1996) (citing *Strickland*, 466 U.S. at 688-90; *Lockhart v. Fretwell*, __ U.S. __, 113 S. Ct. 834, 844 (1993); *Darden v. Wainwright*, 477 U.S. 168, 169 (1986)). "[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.   In any event, Casillas has not demonstrated that he was prejudiced by trial counsel's tactical decisions. It appears that three outcomes were possible had Jose taken the stand: he could have (1) admitted to the crime, which was highly unlikely; (2) invoked the Fifth Amendment and refused to answer questions, which would not have been at all helpful to petitioner; or (3)

reiterated that he did not commit the crime, which similarly would not have been helpful to the defense. Thus, Casillas has not demonstrated that there is a reasonable probability that the outcome of the trial would have been more favorable had trial counsel called his brother as a witness. Accordingly, I recommend dismissal of Casillas' claim of ineffective assistance of trial counsel.

### D.   Prosecutorial Misconduct During Cross-Examination of Petitioner

Petitioner claims that, while cross-examining him, the prosecutor asked questions that amounted to prosecutorial misconduct.  Specifically, petitioner claims (1) that the prosecutor called him a liar and (2) "made note that the [petitioner] knew who the police where [sic] being a foreigner in the United States." Petition at 6 (Docket No. 1).  The basis of the petitioner's first contention is the prosecutor that the confronted petitioner with the fact that his testimony contradicted the testimony of the State's witnesses, thereby implying (but not stating explicitly) that he was lying.  See, e.g., T. 322-324, 327-331. The second contention seems to be based on two questions posed by the prosecutor during cross-examination. *See* T.331 ("You have been in this country for more than three years?" and "You are familiar with the police?"). After the second question, trial counsel objected and the trial court sustained the objection. T.331.  This issue, therefore, was apparently resolved at trial in the petitioner's favor.

As discussed above, the respondent asserts that the prosecutorial misconduct claim is procedurally barred because the Appellate Division relied upon an adequate and independent state ground (i.e., the failure to object at trial) in denying it on appeal. *See* Respondent's Memorandum of Law, at 6; *People v. Casillas*, 289 A.D.2d at 1064 ("Defendant failed to preserve for our review his contention that the prosecutor erred by forcing defendant to

characterize the People's witnesses as liars during cross-examination of defendant (*see* CPL 470.05(2); *People v. Holden*, 224 A.D.2d 961, *lv. denied*, 91 N.Y.2d 926) and we decline to exercise our power to review that contention as a matter of discretion. . . .”). Under C.P.L. § 470.05(2),[2] in order to preserve a claim of prosecutorial misconduct during summation for appellate review, a defendant must object to the remarks during trial, and, following the objection, request further instructions, or, after the court issues a curative instruction which the defense does not believe cure the error, move for a mistrial. *See*, *e.g.*, *People v. Heide*, 84 N.Y.2d 943, 944 (N.Y. 1994) (holding that prosecutorial misconduct claim was unpreserved where defense counsel failed to object further or request a mistrial after court issued curative instructions). Respondent argues that the Appellate Division's reliance upon C.P.L. § 470.05(2) invokes the adequate and independent state ground doctrine and bars habeas review of the prosecutorial misconduct claim.

The adequate and independent state ground doctrine precludes federal habeas review of a claim “as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.” *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 1044 n. 10 (1989); *accord*, *e.g.*, *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). “The rule that ‘an adequate and independent finding of procedural default will bar federal habeas review of the federal claim,’ *id.* 109 S.Ct. at 1043, applies, absent a showing of cause for the default and resulting prejudice, *see Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), or a demonstration that failure to consider the federal claim will result in a ‘”fundamental miscarriage of justice.”’” *Velasquez*, 898 F.2d at 9

---

[2]     The statute, known as the “contemporaneous objection rule,” requires that an objection to an alleged error be made “at the time of such ruling or instruction or at any subsequent time when the court ha[s] an opportunity of effectively changing the same.” N.Y. Crim. Proc. Law § 470.05(2).

(quoting *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). Since the Appellate Division rested its decision on Petitioner's failure to comply with the contemporaneous objection rule, an independent and adequate state ground, the claims are barred. *See Velasquez*, 898 F.2d at 8, 9 (holding violation of New York's contemporaneous objection rule is an independent and adequate state ground in failing to preserve a claim that the prosecutor made improper comments during his opening statement and in summation).

Petitioner has not asserted any cause for his failure to make timely objections or request further instructions or move for a mistrial nor has he shown any resulting prejudice.He has also not demonstrated that he is factually innocent so as to fulfill the requirements of the fundamental miscarriage of justice exception. Therefore, the Court recommends finding that prosecutorial misconduct claim is procedurally defaulted and accordingly recommends dismissal on that basis.

E.     **Ground Five: Erroneous Denial of C.P.L. § 330.30 Motion Based On Newly Discovered Evidence (Errors by the Court Interpreter and Prior Inconsistent Statements by a Prosecution Witness)**

Petitioner claims that the trial court erred in denying his C.P.L. § 330.30 motion to set aside the verdict which was based upon two grounds: (1) errors by the court interpreter during testimony by witnesses for the petitioner,[3] and (2) newly discovered evidence about prior

---

[3]     The errors allegedly made by Franco, who served as the court interpreter during the testimony of two of the petitioner's witnesses (Rivera and Melendez), were detailed in the petitioner's motion papers. *See* Affidavit of Court Interpreter Elonia Giron. According to petitioner, the errors consisted of the following:

(1) The interpreter used the Spanish word for "fight" instead of the word for "argument"when translating a question by the prosecutor during Rivera's cross-examination. The prosecutor apparently asked Rivera if she had an "argument" with the petitioner on the date of the attempted robbery. T. 232.
(2) The interpreter translated on of the prosecutor's questions to Rivera as whether the petitioner was wearing a "coat" ("abridge" in Spanish) and "hat" ("gorro" in Spanish); however, prosecutor only asked if the petitioner was wearing a coat. T. 231.
(3) In response to a question during direct examination, Melendez said that petitioner's brother was wearing a "handkerchief" ("pannuelo" in Spanish) on his face. The interpreter, however,

inconsistent deposition testimony given by Mrs. DiPirro in an unrelated civil action.[4] The trial

court denied petitioner's C.P.L. § 330.30 motion because the defense had not objected to the

alleged errors by the interpreter at trial. T.508.  The Appellate Division affirmed the trial court's

denial of petitioner's C.P.L. § 330.30 motion, holding that

> We reject the further contention of defendant that County Court erred in denying
> his motion to set aside the verdict based on newly discovered evidence (*see*, [N.Y.
> Crim. Proc. Law] 330.30(3)). The minor errors made by the interpreter were
> known during trial and therefore were not newly discovered evidence (*see*, *People
> v Salemi*, 309 NY 208, 215-216, *cert denied* 350 US 950). The statements made in
> a civil proceeding by one of the victims herein that were allegedly inconsistent
> with the victim's testimony at this trial constitute impeaching evidence, and such
> evidence would not justify reversal (*see*, *People v Salemi*, *supra*, at 215-216;
> *People v McCullough*, 275 AD2d 1018, 1019, *lv denied* 95 NY2d 936).

*People v. Casillas*, 289 A.D.2d at 1065.  This holding was neither contrary to, nor an

unreasonable application of, clearly established Supreme Court precedent.

I turning first to the alleged newly discovered evidence of errors by the court interpreter.

As a general matter, the Supreme Court observed that such claims have never been held to state a

ground for federal habeas relief absent an independent constitutional violation occurring in the

---

translated Melendez's testimony for the jury by stating that the petitioner's brother was wearing a
"t-shirt" on his face.  T. 253-254.
(4)  In response to another question during direct examination, Melendez said that petitioner was
wearing a "hat" ("gorro" in Spanish). The interpreter apparently translated Melendez's testimony
for the jury by stating that the petitioner was wearing a "hooded sweatshirt".  T. 253.
(5) On direct examination, Melendez also stated that the petitioner was wearing a "white
sweatshirt" ("blanco swete" in Spanish). The interpreter translated Melendez's testimony for the
jury by stating that the petitioner was wearing a "sweater".  T. 253.

[4]       According to petitioner, Mrs. DiPirro's deposition testimony in an unrelated civil action was
inconsistent with her testimony at his trial.  At the criminal trial, Mrs. DiPirro testified that the petitioner had
frequented the pizzeria several times a week for six weeks prior to the date of the attempted robbery, November 14,
1997.  T. 114-115.  Petitioner's attorney learned about Mrs. DiPirro's allegedly conflicting deposition testimony
after the jury's verdict.  In the deposition testimony, Mrs. DiPirro's statements indicated that she was not *working* at
the pizzeria for some unspecified period of time prior to January 1998.  In denying the petitioner's motion, the trial
court ruled that the newly discovered evidence constituted impeachment material only and that the evidence would
not change the verdict if a new trial was granted.  T.511

underlying state criminal proceeding. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (rejecting non-capital defendant's habeas claim of actual innocence based on newly discovered evidence) (citing *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."). The *Herrera* court explained, "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution–not to correct errors of fact." *Id.* (citations omitted).

Casillas has not demonstrated that any independent constitutional violation occurred at his trial, or that he was deprived of a fair trial overall due to the allegedly faulty translations. This case is entirely distinguishable from *United States ex rel. Negron v. New York*, 434 F.3d 386, 390-91 (2d Cir. 1970), in which the Second Circuit granted habeas relief because the interpreting at trial was inadequate where the interpreting was "wholly inadequate[,]" *Suarez v. Stinson*, No. 97 CIV. 3039(DC), 1999 WL 335373, at *6 (S.D.N.Y. May 26, 1999) (citing *Negron*, 434 F.3d at 390-91). In *Negron*, the interpreter was not always present during the trial, and even when present, would only summarize the testimony and court proceedings during breaks rather than during trial itself. *Id.* at 388. The Second Circuit held that "[h]owever astute [the interpreter's] summaries may have been, they could not do service as a means by which Negron could understand the precise nature of the testimony against him during that period of the trial's progress when the state chose to bring it forth. Negron's incapacity to respond to specific

29

testimony would inevitably hamper the capacity of his counsel to conduct effective cross-examination." *Id.* Here, the trial court and the Appellate Division concluded that the alleged errors by the translator were not "newly discovered" since the defense was aware of them at trial. Moreover, the state court found that the errors were "minor" and did impinge upon the fairness of the proceeding. Habeas courts must apply a presumption of correctness to determinations of factual issues by the state courts, 28 U.S.C. § 2254(e)(1), and Casillas has not fulfilled his heavy burden of showing by clear and convincing evidence that the state courts' determinations were factually incorrect.  For these reasons, I recommend finding that habeas relief is unwarranted with regard to his claim of errors by one of the court interpreters.

Turning next to his contention regarding Mrs. DiPirro, which suggests that she perjured herself at trial, I also recommend finding that habeas relief is not warranted.  It is the "established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution." *Drake v. Portuondo*, 553 F.3d 230, 240, 241 (2d Cir. 2009) (citations omitted). As an initial matter, however, Casillas has not demonstrated that Mrs. DiPirro perjured herself at trial. As the Appellate Division pointed out that the statements by Mrs. DiPirro from the civil proceeding constituted impeaching evidence.  "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959). However, Casillas can demonstrate neither that the evidence constituted false testimony as mere inconsistencies due to mistake or faulty memory do not amount to perjury. For example, Mrs. DiPirro may have been working during the six weeks prior

to November 14, 1997, and that would not be inconsistent with her deposition testimony, which did not include a reference to the date prior to January 1998 when she stopped working at the pizzeria. Also, she may have been at the family-owned pizzeria during the six weeks prior to November 14,1997, but not working. Furthermore, and most important, is the lack of materiality of this evidence. Even if Casillas could show that Mrs. DiPirro's testimony at trial was false, "the use of, or the failure to correct, false testimony does not rise to the level of a constitutional violation 'unless it can be said that there was a reasonable likelihood that the testimony affected the judgement of the jury or that it may have had an effect on the outcome of the trial.'" *Clark v. Irvin*, 844 F. Supp. 899, 908 (N.D.N.Y. 1994) (denying habeas relief based on claim of newly discovered evidence of perjury) (quoting *Mills v. Scully*, 826 F.2d 1192, 1195 (2d Cir. 1987) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue*, 360 U.S. at 271; *United States v. Petrillo*, 821 F.2d 85 (2d Cir.1987)). The trial court specifically found that the evidence was lacking in materiality, holding that "in light of the overwhelming proof of guilt and positive identification . . . by another witness . . . it cannot be said that this alleged newly discovered evidence is of such quality and nature that would probably change the verdict." T. 511. This determination was reasonable in light of the evidence presented at trial, *see* 28 U.S.C. § 2254(d)(2). Overall, the state courts did not unreasonably apply clearly established Federal law in rejecting Casillas' claim of newly discovered evidence based upon the allegedly inconsistent deposition testimony of Mrs. DiPirro. Accordingly, I recommend denial of relief on this aspect of Casillas' fifth claim.

## VI.    Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of

habeas corpus filed by petitioner be **denied**. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, the Court recommends that no certificate of appealability issue with respect to any of petitioner's claims.

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: August 21, 2009
       Rochester, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

33

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: August 21, 2009
      Rochester, New York